Gerald E. Hawxhurst (Bar No. 220327)
jerry@hawxhurstllp.com
Patrick B. Nichols (Bar No. 294389)
pat@hawxhurstllp.com
HAWXHURST LLP
10000 Santa Monica Blvd., Unit 3406
Los Angeles, California 90067
Telephone: (310) 893-5150
Facsimile: (310) 893-5195

Matthew B. Henneman (*pro hac vice*)
mhenneman@hrklaw.com
George H. Rau III (*pro hac vice*)
grau@hrklaw.com
Joseph A. Cialone III (*pro hac vice*)
jcialone@hrklaw.com
Ryan Mulvihill (*pro hac vice* forthcoming)
rmulvihill@hrklaw.com
HENNEMAN RAU & KIRKLIN LLP
815 Walker Street, Suite 1440
Houston, Texas 77002
Telephone: (713) 955-6030
Facsimile: (713) 955-6141

Attorneys for Plaintiff,
ALLIANTGROUP, L.P.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ALLIANTGROUP, L.P.,

Plaintiff,

vs.

ONSHORE TECHNOLOGIES, INC. f/k/a SPRX TECHNOLOGIES, INC., a Delaware corporation; and DOMINIC VITUCCI, an individual,

Defendants.

Case No.: 2:26-cv-02997 MWC-RAO

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES FOR:**

1. **FALSE ADVERTISING OF ONSHORE'S SERVICES IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a)(1)(B));**
2. **FALSE ADVERTISING OF ALLIANTGROUP'S SERVICES IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a)(1)(B));**

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

**3. VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*);**
**4. TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS;**
**5. VIOLATION OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200); AND**
**6. VIOLATION OF THE FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500)**

**DEMAND FOR JURY TRIAL**

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Plaintiff Alliantgroup, L.P. ("Alliant" or "Plaintiff") files this First Amended Verified Complaint and Application for Injunctive Relief against Defendants Onshore Technologies, Inc. f/k/a SPRX Technologies, Inc. ("Onshore") and Dominic Vitucci ("Vitucci") (collectively, "Defendants") as follows:

**NATURE OF ACTION**

1. Alliant seeks preliminary and permanent injunctive relief against Defendants' false advertising and unfair business practices that are broadcast to customers and potential customers in the stream of commerce throughout the United States, including California, as well as damages caused by their illegal conduct. Onshore is a direct competitor of Alliant in California and elsewhere throughout the U.S. in the provision of advisory services to clients seeking to qualify for the federal Research and Development Tax Credit ("R&D Tax Credit"), codified under Internal Revenue Code ("IRC" or "the Code") Sections 41 and 174. As Defendants recognize in their national advertising—which is also targeted to California—the R&D Tax Credit is "one of the most complicated provisions in the Code"[1] and establishes a complex four part per-activity test that requires deep subject matter expertise and the exercise of informed professional judgment to arrive at accurate and defensible figures.

2. By skipping the rigorous analysis that the Code requires for determining R&D Tax Credits, Defendants claim to have developed a faster, cheaper, and easier way for taxpayers to obtain the R&D Tax Credit by assigning to artificial intelligence ("AI") much of the analysis ordinarily done by human experts. Defendants boast that their AI models "do the heavy lifting" in calculating credits, a process Defendants proclaim to be wholly "aligned with IRS standards." Defendants promote that they produce "audit-ready documentation" without the need for humans, whose expertise they deridingly refer to as causing "retroactive interviews," "bloated billable hours," and "documentation scramble." Moreover, Defendants promise to conduct the full extent of

[1] See Suder v. C.I.R., 108 T.C.M. (CCH) 354 (T.C. 2014).

their R&D Tax Credit work in an incredibly short average timeframe of only "2-3 weeks."

3. Defendants' claims are misleading, false, and unfair. While AI has made significant progress in recent years, even the most advanced AI models cannot replicate the analysis and professional judgment that tax professionals, including those at Alliant, employ when calculating an R&D Tax Credit. While Defendants advertise that their AI models operate under the supervision and expert review of competent tax professionals specializing in the R&D Tax Credit, this cannot be true. Defendants have neither the expertise, qualifications, nor manpower to conduct a proper expert review, and Alliant will demonstrate this at trial.

4. The accurate calculation of a client's defensible R&D Tax Credit requires significant back-and-forth with the client and tax professionals. Frequently, the tax professional needs to engage in multiple rounds of interactive discussions with the client on how the client tracks its research-and-development-oriented activities, phases, and tasks to determine which items may qualify for the R&D Tax Credit, and to what extent they qualify (e.g., what percentage of an individual employee's wage can be attributable to time spent on "qualified research" when performing a particular activity). Not only is it impossible for Defendants to be substantively engaging with the granular level of detail necessary for accurately calculating the R&D Tax Credit with artificial intelligence, they also openly advertise that they do not rely on client interviews for substantiation, a step which is often necessary because many taxpayers do not document the time that employees spend on particular R&D activities.

5. As detailed below, Alliant has reviewed exemplars of Defendants' incoherently sloppy work product, and discovered that Defendants' advertising is false, misleading, and unfair. In that work product, Alliant discovered egregious errors that run contrary to the IRC, and whose implementation would subject any one of

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Defendants' "500+ companies served"[2] to serious regulatory penalties. Through their shortcuts, Defendants are subjecting their clients to significant risk and steep penalties should they ever be audited by the IRS.

6. Separately, Defendants have also improperly and tortiously solicited Alliant employees to leave Alliant and join their ranks. This inducement has cumulated in numerous Alliant employees breaching their separate and independent contractual obligations to Alliant, the misappropriation of Alliant's confidential information, and the loss of significant client goodwill and consumer confidence. Critically, Defendants have primarily focused their employee solicitation efforts on Alliant's business development personnel rather than its R&D Tax Credit subject matter experts. By focusing on sales personnel rather than the tax professionals with the deep understanding of how the R&D Tax Credit functions, it is apparent that Defendants are striving to quickly increase the size of their client base rather than the quality of their work product.

7. Through forensic analysis, Alliant knows that ex-employees accessed and misappropriated its confidential information at or near the times of their resignations, including highly confidential taxpayer identification information protected under Internal Revenue Code Section 7216. This confidential information contains clients lists, referral sources, pricing structures, and proprietary R&D Tax Credit strategies and methodologies that Alliant spent millions of dollars developing. Upon information and belief, Defendants use Alliant's confidential information and trade secrets not only to contact and forge relationships with Alliant's clients, prospective clients, and referral sources, but also to guide their AI models, and pass off Alliant's work product as their own via flawed "updates." To be clear, and upon information and belief, because Defendants have only *copied* Alliant's confidential information datapoints without fully performing the necessary substantiating R&D Tax Credit analysis themselves (e.g., by

[2] Id.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

employing human professional judgment), their reports are heavily flawed. Defendants' use of Alliant's confidential information and trade secrets is a violation of 18 U.S.C. § 1836, otherwise known as the Defend Trade Secrets Act ("DTSA").

8. Defendants have also actively sought to interfere with Alliant's client and industry relationships—including those throughout California—by spreading falsehoods about Alliant and encouraging Alliant clients and prospective clients—including clients and prospective clients in California—to either discontinue or never use Alliant's R&D Tax Credit services. As a central element of this disparagement, Defendants have falsely informed customers and business relationships—including those in California—that "everything [Alliant] does is offshore and sent to India." These statements are verifiably false. In furtherance of this lie, Defendants openly admit that Onshore recently "rebranded" on or about February 2, 2026 from SPRX to "Onshore" to further advertise this misinformation by way of juxtaposition ("*offshore*" vs. "*onshore*").

9. Through advertising on their website, social media and podcast appearances, instant messaging, and direct communication with clients and business relationships—including those in California—Defendants engaged in an intentional and systemic pattern of activity to misleadingly promote their own products and services, while also discrediting and disparaging Alliant. Defendants have promised an "audit-ready," "defensible," and expert-reviewed standard of quality to prospective and current clients, including those in California, that they cannot deliver, and these false statements have caused harm to Alliant. Defendants' further false statements regarding Alliant sending its services "offshore" have further harmed Alliant, especially in California. Defendants' false, deceptive, and misleading advertising constitutes violations of both state law and 15 U.S.C. § 1125(a)(1)(B), otherwise known as the Lanham Act's False Advertising prong.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

## THE PARTIES

10. Plaintiff Alliantgroup, L.P., is a limited partnership organized under the laws of Texas, and has its principal place of business in Harris County, Texas. Alliant is also registered to conduct business in the state of California, conducts a significant amount of business in the state of California, and maintains a physical office location in Orange County, California.

11. Defendant Onshore Technologies, Inc., is a corporation incorporated under the laws of Delaware. Onshore may be served through its registered agent The Corporation Trust Company, located at 1209 Orange Street, Wilmington, DE 19801. Upon information and belief, Onshore has offices in Los Angeles and Irvine, California, and maintains a principal place of business in the state of New York, located at 263 W. 38th Street, 10th Floor, New York, NY 10018. Onshore may also be served through its registered agent in New York, Registered Agents Inc., located at 418 Broadway Ste. R. Albany, NY 12207. On information and belief, Onshore does significant business in the State of California and conducts significant advertisement in California.

12. Defendant Dominic Vitucci is an individual who, upon information and belief, resides in the state of Illinois. He may be served at 540 N. State Street, Apartment 1809, Chicago, IL 60654, or wherever he may be found.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Alliant's claims arise under the Constitution, laws, or treaties of the United States, including the Lanham Act and the DTSA. Additionally, this Court has supplemental jurisdiction over Alliant's California state law and other claims pursuant to 28 U.S.C. § 1367 because those claims arise under the laws of California and are proximately caused by Onshore's illegal conduct that occurred within and/or was directed to the State of California, and are also so related to Alliant's Lanham Act and DTSA claims that they form part of the same case or controversy.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

15. Alliant maintains an office and staff in this district. Moreover, Alliant has approximately 823 current active clients in California, and 254 certified public accountants that serve as critical business referral sources for Alliant in California.

16. Onshore is registered to do business in the state of California. Upon information and belief, and according to Onshore's website and job postings[3] [4], Onshore also has an office and staff in this district that is actively recruiting to fill positions in, including for sales roles to increase its activity in the district. Onshore employs ex-Alliant employees in this district, including Lon O'Connor, Onshore's Chief Revenue Officer. Onshore employes at least two other former Alliant employees that lived, and seemingly still live, in California, and Onshore does significant business and solicits business from persons and entities in California. Onshore also employs multiple individuals in the state of California and presumably pays California state income and payroll taxes. Harm from their actions will be felt in California.

17. Alliant maintains an interactive website wherein California consumers can indicate their state of residence as California. Further, the Alliant privacy policy, made available on their website, informs California residents of their rights under the

[3] Defendants, through the previously filed DECLARATION OF DOMINIC VITUCCI IN SUPPORT OF DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT, declared Onshore does not have an office in California. (Dkt. 45). This is belied by Onshore's website which indicates there is both a Los Angeles, California and Irvine, California office, and that they are actively hiring a Business Development Director for the Irvine, California office. Onshore Careers, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026), https://careers.kula.ai/onshore.

[4] Third-party websites also contain a job posting for SPRX with the initial location being Irvine, California; though the posting later denotes it is a remote role, the emphasis on finding California based individuals shows the intent to maintain a presence in California and cause harm to Alliant in California (*see infra*). Business Development Director, SPRX, RevGenius Jobs, https://revgenius.jobfront.io/jobs/J6d67c7b840274bc3a5b36d2e551e7939/sprx/business-development-director-J6d67c7b840274bc3a5b36d2e551e7939 (last accessed July 29, 2026).



HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

California Consumer Privacy Act.[5]

18. Onshore purposefully cultivated contacts with California by seeking and obtaining investment ($500,000) and business acceleration through a California-based startup accelerator, Y Combinator, thereby availing itself of California's entrepreneurial ecosystem, investor network, and business resources to grow its operations.

19. Onshore misappropriated Alliant's confidential and proprietary information, information that includes information related to Alliant's California operations. Including, but not limited to, sales activity in California, client lists (including California clients), CPA Referral Source lists (including California CPA referral sources), email-target lists (including California email targets), and opportunity trackers (including California opportunities).

20. Defendants' misappropriation and usage of Alliant's confidential and proprietary information, combined with their false and misleading advertising (discussed *infra*), has allowed Defendants to unfairly compete with Alliant throughout California, and Defendants have deliberately solicited a former Alliant client in this district and solicited and/or poached multiple others throughout the state of California. This is a direct result of Onshore's use of Alliant's confidential and proprietary information.

21. Upon information and belief, Defendants' misappropriation and use of Alliant's confidential and proprietary information, together with the coordinated recruitment of Alliant's personnel, materially accelerated Onshore's growth and competitive position within the marketplace. Rather than developing these relationships, institutional knowledge, and business advantages independently, Onshore allegedly leveraged information and personnel wrongfully obtained from Alliant to expand its operations, increase revenues, and enhance its valuation. Onshore

[5] California, and its statutory protections, is the only state referenced in Onshore's Privacy Policy, indicating a clear intent and desire for Californians to receive and interact with their website and related spurious advertisements.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

subsequently used that enhanced business profile in seeking and obtaining successive rounds of venture capital financing, including funding through the aforementioned California-based Y Combinator. Onshore's California-based activities, including its pursuit of investment through Y Combinator and the broader California investment ecosystem, enabled Onshore to continue exploiting Alliant's confidential information and customer relationships, thereby deepening and prolonging the harm inflicted upon Alliant.

22. Alliant has suffered harm in the state of California as a result of Onshore's unlawful conduct, and a significant portion of that unlawful conduct took place in California.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. Alliant's R&D Tax Credit Consulting Business

23. Alliant is a national tax consultancy based in Houston, Texas, specializing in calculating the R&D Tax Credit. Alliant has been in this business for almost twenty-five (25) years and is a well-known leader in this market. Alliant has developed a battle-tested strategy and proprietary methodology for calculating the R&D Tax Credit, and has successfully defended its methodologies and analysis in multiple tax controversy cases centered around the R&D Tax Credit.

24. Alliant has grown and developed as a market leader by recruiting and training its employees, developing a steady client base, and forging relationships with certified public accounting firms who prepare tax returns that serve as critical referral sources for future business development ("CPA Referral Sources").

25. Alliant's principal points of contact in developing and maintaining these valuable relationships with clients and CPA Referral Sources are its business development employees who are located throughout the U.S., including, significantly, California. These business development employees focus on working with clients, prospective clients, and CPA Referral Sources in particular geographic markets across

the country, including California. Indeed, Alliant's business development employees serve as the face of Alliant in these markets.

26. Alliant has invested substantial amounts of time and money in developing its R&D Tax Credit calculation strategies and methodologies, in maintaining goodwill with its clients and CPA Referral Sources across the United States, and in its business development employees, including those that have been solicited and hired by Onshore.

**B. Alliant's Confidential Information**

27. Alliant's confidential information includes proprietary information regarding its process for calculating the R&D Tax Credit, including details on how it interviews clients, the documentation it collects, the statistical sampling it uses, the final client deliverables it generates, and guidance and training on using professional judgment when interpreting, analyzing, and preparing these items.

28. Alliant's confidential information also includes the identity of its clients and its CPA Referral Sources (including contact information, customized preferences, historical service data, and curated compilations of this information), pricing structures, project strategies, and a range of nonpublic client-specific information that Alliant develops through its engagements and uses to competitively prospect for, serve, and retain its clients and CPA Referral Sources.

29. Specifically, Alliant has developed nationwide client and CPA Referral Source lists secured within multiple internal databases containing valuable confidential information concerning its customers and CPA Referral Sources. These databases contain detailed and unique information not only about these clients' underlying business models, but also these clients' proprietary R&D activity that Alliant's client base rightfully expects to be kept confidential. Alliant has also developed lists of its employees containing their contact information, training records, service history, and particular areas of expertise.

30. The information related to Alliant's R&D Tax Credit analysis and

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

calculations, as well as information related to its customers, CPA Referral Sources, and employees, is exclusively the product of Alliant's investment of massive amounts of time, money, and other resources spent over many years. Specifically, and among other investments, Alliant has invested millions of dollars to develop and maintain this information for its sole benefit.

31. Alliant derives significant value and advantage from the proprietary and secret nature of its confidential information. Alliant's confidential information is critical to its ability to successfully compete in the R&D Tax Credit marketplace because it provides Alliant a competitive advantage over its competitors.

32. Alliant's confidential information is highly valuable to Alliant's competitors because it would allow them to replicate or otherwise use Alliant's R&D Tax Credit calculation methodologies, as well as quickly target and solicit Alliant's employees, customers and CPA Referral Sources without undertaking any of the substantial time, effort, and expense incurred by Alliant in developing such information.

**C. Alliant's Efforts to Protect its Confidential Information**

33. Alliant takes the protection of its information very seriously and expends a great deal of effort and money to keep its information secure.

34. At all relevant times, Alliant has taken extensive and reasonable steps to protect the confidentiality of its confidential information. This includes securing its information in locked premises that require authorization for employee/contractor access, and storing this information in password-protected databases and/or systems (including email systems) that are only accessible by authorized Alliant employees.

35. To further protect its considerable investment in its valuable confidential information, Alliant has required its key employees to be bound by restrictive covenant agreements, which contain confidentiality, non-competition, and customer and employee non-solicitation restrictions.

36. Each Alliant employment agreement prohibits the misuse or disclosure of

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

confidential client information, prohibits solicitation of Alliant clients and CPA Referral Sources, and prohibits competitive employment during certain restricted periods.

37. Alliant's confidential and proprietary information constitutes trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*., because Alliant derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

38. Alliant's confidential information relates to products and services used in and sold in interstate and/or foreign commerce.

39. The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

40. The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable…." 18 U.S.C. § 1836(b)(3)(A).

**D. Artificial Intelligence – The Basics**

41. There are generally considered to be four different levels of AI as of today: (1) intelligent automation, (2) predictive analytics, (3) generative AI, and (4) agentic AI.[6] Each level builds on the previous. Intelligent automation is designed to automate repetitive, simple tasks, like inputting various elements from an invoice onto a sorted spreadsheet. Predictive analytics goes a step further, and by following formulas can predict the next logical sequence in a series. Generative AI accomplishes everything predictive analytics can do, but does so by way of using "natural language" with human users. In other words, interacting with a generative AI model is very conversational,

[6] For additional background, please see Brett Gossfeld and Amy Lin, The Basics: AI Models for Small Business and Startups Explained, SALESFORCE INC. (April 16, 2025).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

and interactive AI chatbots on any number of websites serve as examples of these generative AI models. Finally, agentic AI is the most recent advancement in AI, where the AI can function autonomously, and create and meet objectives for itself without the need for objective-by-objective prompting from human users.

42. To be clear, even the most advanced AI models cannot accurately perform the professional judgment necessary for navigating complex issues such as those found in the IRC and the IRS acknowledges and counsel professionals on this. In light of these analytical shortcomings, many generative and agentic AI models "hallucinate" answers to complete the user's objectives, without ever informing the user that the outputs may be incorrect. In the legal profession, courts across the country, including those in this district, are quickly issuing AI-notices as part of their local rules to combat the issue. By way of example, Judge Karen E. Scott, a Magistrate Judge in the Southern Division of this District, has issued the following notice as part of her procedures:

> **GENERATIVE ARTIFICIAL INTELLIGENCE ("AI").** Counsel are hereby put on notice that AI tools used to draft legal briefs can make mistakes (sometimes called "hallucinations"), including citing non-existent legal authorities. As part of counsel's duties under Federal Rule of Civil Procedure 11, anyone who signs a brief or other court filing that was created, in whole or in part, using AI, certifies to the Court that they have checked and verified the accuracy of the cited legal authorities.

43. In this division, Judge Stanley Blumenfeld Jr. has mandated that if any party uses AI in their briefing, they must attach a declaration verifying that the generated content is accurate due to the rise of AI "hallucinations":

> **Artificial Intelligence**. Any party who uses generative artificial intelligence (such as ChatGPT, Harvey, CoCounsel, or Google Bard) to generate any portion of a brief, pleading, or other filing must attach to the filing a separate declaration disclosing the use of artificial intelligence and certifying that the filer has reviewed the source material and verified that the artificially generated content is accurate and complies with the filer's Rule 11 obligations.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

44. Orders like these are increasingly becoming necessary in the wake of errors made by AI models. The list of cases in which a party or their counsel have been sanctioned for using AI without reviewing the output is growing by the day. See, e.g., N.Z. v. Fenix Int'l Ltd., 2025 WL 3626155, at *5 (C.D. Cal. Dec. 12, 2025); Lacey v. State Farm Gen. Ins. Co., 2025 WL 1363069, at *1 (C.D. Cal. May 5, 2025); and Fang v. Hechalou US LLC, 2025 WL 3049873, at *4 (C.D. Cal. Sept. 12, 2025).

45. In the accounting realm, the Taxpayer Advocate Service ("TAS"), an independent organization within the IRS, has similarly cautioned against the use of AI. TAS notes that while "AI can be a useful tool in streamlining the overall tax filing process, *taxpayers should not rely on AI-generated responses to complex tax questions*" because "[d]espite efforts to ensure accuracy … *AI assistants may encounter difficulties interpreting complex tax laws correctly* or considering unique circumstances that could impact a taxpayer's return."[7]

46. Similarly, on March 5, 2026, the IRS released its 2026 "Dirty Dozen" list of tax scams "that threaten the tax and financial information of taxpayers, businesses, and tax professionals."[8] In that list, the IRS states that "[t]axpayers should not rely on AI-generated responses to complex tax questions, and they should verify any calculations or information provided by artificial intelligence."[9]

47. There are countless concerns with relying too heavily on AI in tax accounting. Tax forms and rules change annually, and the AI models being used may be overly reliant on outdated criteria that formed the basis of its training.[10] Importantly, "AI cannot ask follow-up questions in the way a human tax professional would. Instead,

---

[7] Is AI Generated Tax Advice Making the Grade?, TAXPAYER ADVOCACY SERVICE (June 11, 2024, updated January 7, 2026) (emphasis added).
[8] Dirty Dozen tax scams for 2026: IRS reminds taxpayers to watch out for dangerous threats, INTERNAL REVENUE SERVICE, IR-2026-30 (March 5, 2026).
[9] Id.
[10] Risks of Using AI for Tax Preparation: What Taxpayers Must Know, DAVIDOV & ASSOCIATES, CPA (last accessed March 6, 2026).

it fills gaps with assumptions based on common patterns in its training data."[11] AI models are still subject to the "fundamental limitation that AI applies pattern matching to generate outputs based on training data, not [a] genuine understanding of … individual circumstances."[12]

### E. Onshore Targets Consumers—Including Those Within California—By Using False Advertising on its Website

48. After Vitucci was fired from Grant Thornton, LLP, he went on to found Onshore in 2020.[13] Like Alliant, Onshore provides consulting for business clients on claiming the R&D Tax Credit. However, Onshore heavily leverages AI in its R&D Tax Credit analyses, which it claims "[a]utomates 80 percent of the R&D process."[14]

49. At one point operating under the mantra "Maximize tax incentives, Minimize the work," Defendants advertised that "accuracy isn't optional."[15] Defendants have promoted their system as being "AI-Powered, Human Led" because their R&D Tax Credit studies are "reviewed by experts who stand behind [them]."[16] Defendants promise that their work product is built "on contemporaneous evidence, so results are owned, repeatable, and defensible."[17]




---

[11] Id.

[12] Id.

[13] Up until its "rebranding" in February 2026, Onshore operated as "SPRX Technologies, Inc." For purposes of continuity, the use of the reference "Onshore" is intended to also include reference to "SPRX Technologies, Inc."

[14] R&D Tax Credits Simplified, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026), https://onshore.com/rd.

[15] ONSHORE TECHNOLOGIES, INC., https://onshore.com (last visited March 6, 2026).

[16] Id.

[17] Id.



HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

50. Defendants invite consumers to designate their state, specifically including California consumers[18], when applying for a "Free Assessment"[19]:




51. Defendants promote a simple 4-step process that allows potential clients to claim the R&D Tax Credit: (1) "Share your data your way" where "[a]ny format works;" (2) "Let AI do the heavy lifting" which means that Onshore's "system reviews every document and flags what's missing. It's fast, accurate, and aligned with IRS standards;" (3) "Validate with a real expert" that "gives your team peace of mind and

[18] As mentioned *supra*, Defendants undoubtedly expect California consumers to interact with their website and/or retain Onshore's services, as they specifically reference California's Consumer Privacy Act within their Privacy Policy. Privacy Policy, ONSHORE TECHNOLOGIES, INC. (last accessed July 29, 2026).

[19] Free Assessment, ONSHORE TECHNOLOGIES, INC. (last accessed July 29, 2026).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

sets the stage for confident filing;" and (4) "Approve and file with confidence" because "[o]nce you're aligned, we generate your audit-ready tax package with full calculations and supporting documentation."[20]

52. In addition to promoting their purported easy but accurate program, Defendants also malign their competitors, including Alliant: "Traditional tax services are bloated, expensive, and outdated. They rely on hours of back-and-forth, messy spreadsheets, fragmented interviews, and assumptions that don't hold up under scrutiny."[21] Onshore portrays the important process idea of "back-and-forth with CPA's" as a negative, while boasting that it can have "[r]eports filed in weeks, with transparency and ownership end to end" and has "[a]udit-ready documentation built in, not bolted on."[22]




53. Defendants advertise five (5) core beliefs in: (1) "outcomes," where "[r]esults are owned and defensible;" (2) "transparency," where "[e]very number traces to source data;" (3) "human judgment," where "[t]echnology supports [and] [e]xperts

[20] Id.
[21] SPRX is now Onshore, ONSHORE TECHNOLOGIES, INC. (last accessed July 29, 2026).
[22] Id.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

decide;" (4) "progress" that places "[a]ccuracy first [and] [s]peed follows;" and (5) "accountability" when "[a]udit-ready is built in, not optional."[23]




54. Defendants claim that "the Onshore team brings together tax experts, engineers, and product builders to deliver results that are structures, defensible, and owned from start to finish."[24] Defendants advertise that they "verify the results" of their R&D Tax Credit studies because their "tax team validates every prediction." This cumulates in clients receiving "an audit-ready report" where their "R&D claim is packaged with everything [they] need to file, plus built-in audit support if the IRS ever comes knocking."[25]

[23] Onshore. Rebuilding professional services, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).
[24] Id.
[25] R&D Tax Credits Simplified, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).



HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195




55. Defendants advertise that client data is safe because their "files stay on U.S. servers and inside [their] private data room. We're fully SOC 2 compliant and never keep data longer than needed."[26] Under a hypothetical question of "Who are your experts?" Defendants claim that their "tax team has over 40 years of experience, including former R&D leads from top firms like Grant Thornton."[27] Defendants advertise to potential clients that they will not "need to provide different data than usual" because they "work with whatever you've used in the past."[28]

56. Onshore also advertises purported client testimonials. One of these testimonials reads: "Onshore completed our study in about 10 days with *zero back and forth*. The process was clear, fast, and dramatically smoother than our old provider."[29]

57. Defendants have also explicitly named Alliant on Onshore's website, and promised to "deliver[] audit ready studies 90% faster" than Alliant.[30] Defendants claim

[26] Id.
[27] Id.
[28] Id.
[29] SPRX is now Onshore, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).
[30] Onshore vs alliantgroup, ONSHORE TECHNOLOGIES, INC. (last accessed March 18, 2026).

that their R&D Tax Credit analysis is "[b]uilt on 100% of [a client's] real payroll and project system evidence, not statistical samples… [with] [f]ull, auditable chain-of-custody on every credit… [and] [n]o narrative-first reconstruction or assumption stacking."[31] Defendants further claim that they offer "[s]tructured expert review."[32]




58. Onshore's website also directs potential clients to a "blog" wherein Vitucci and Onshore employees post information on various R&D Tax Credit related topics, and Onshore's relates processes:

---

[31] Id.

[32] Id.



HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

a. February 17, 2026:[33]

i. "*Where a traditional firm takes 270 days to complete an R&D credit study, our platform takes 28 days.* That isn't marginal improvement. It's a fundamentally different architecture and a signal of what's possible when you replace analog workflows with AI."

ii. "Onshore is not a tech-enabled service or a better spreadsheet. *It's an AI-native platform that replaces manual CPA workflows with continuous, automated tax intelligence. That means automation where it belongs and expert judgment where it matters most.* Documentation created at the point of work. *Every claim traceable to source data*. Every company is getting access to the same caliber of tax optimization. *Over 500 companies have trusted us to identify and defend more than $600 million in incentives.* Many came to us after frustrating experiences with traditional providers. *They stayed because the results spoke for themselves."*

b. November 6, 2025:[34]

i. "We built [Onshore] to remove guesswork from R&D credit studies. *Instead of sampling data, we analyze everything: every project, activity, and W-2 record.* Data-driven benchmarking compares your qualified wages and supply costs to industry peers. AI-powered analysis tests the strength of your documentation and evaluates how it would hold up in an IRS exam. *Expert validation confirms accuracy, defensibility, and compliance with the latest regulations.* The result is a credit built on precision, not assumption. Fast, transparent, and *audit-ready from day one.*"

c. October 27, 2025:[35]

i. "An audit-ready R&D credit study does more than calculate a number; it tells a defensible story about how innovation happened. *Here's the framework tech-enabled firms like [Onshore] are able to deliver for clients in less than a month.*

[33] Dominic Vitucci, Onshore: A New Name and $31M Series B, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).
[34] The R&D Credit Sanity Check, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).
[35] Lou O'Connor, The Future of R&D Credits: How AI is Transforming R&D Tax Credits, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Phase 1: Data Integration

- Pull structured data from payroll, GL, project management, and version-control systems.
- Link every dollar of Qualified Research Expenses (QREs) to a documented project or activity.

Phase 2: Technical Review

- *Engage engineers, architects, or developers to validate true experimentation.*
- Filter out non-qualifying administrative or support work.
- *Ensure every qualifying activity aligns with Section 41 definitions.*

Phase 3: Quantification and Documentation

- Reconcile QREs with payroll, supplies, and contractor data.
- Record assumptions and allocation methods clearly.
- *Create an audit-ready deliverable with schedules, narratives, and supporting evidence.*

Phase 4: Filing and Monitoring

- Provide you with the confidence to file, knowing your methodology is transparent.
- Monitor for IRS or state notices, and be ready to defend your position with data, not anecdotes."

d. October 20, 2025:[36]

i. "The tax system wasn't built for the pace or precision modern business demands. It was built for forms, not people. *[Onshore] exists to redefine it with intelligence that understands the law, honors the details, and restores trust in the process.*

ii. *At [Onshore], every study includes in-product citations that make each calculation traceable and audit-ready.* Compliance isn't a box we check; it's a system we build into every model.

iii. At [Onshore], our models are built for compliant reports and real financial results *backed by tax-expert oversight.*

[36] Dominic Vitucci, The Tax AI Guide: Selecting Tax Tech You Can Trust, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

iv. At [Onshore], we build custom integrations with the most popular work management tools to ensure the most seamless document collection experience. *Most clients spend no more than 2 hours on data gathering.*

v. *[Onshore] automatically reviews 100% of payroll, project data, and costs.* Clients have seen up to 20% more qualified credits on average and reduced filing timelines from 270 days to 28 when using [Onshore] vs traditional firms.

vi. *Behind every AI-powered study at Onshore is a team of seasoned tax professionals; real humans who steer the process, review every detail, and collaborate with you to ensure nothing is left to chance.* Additionally, [Onshore] offers Audit Defense in the event of an IRS or state tax audit.

vii. *Can the IRS accept AI-generated documentation? Yes. As long as the documentation meets IRS standards* - showing clear audit trails, provides information required by the IRS and substantiates the claim, and incorporates human review — it is acceptable to provide to the IRS. The key is defensibility, not the method of preparation.

viii. *How does AI help identify more eligible R&D credits? AI systems can process 100% of payroll, general ledger, and project data.* This is far more than traditional manual reviews and at faster speeds. By analyzing all eligible activities and linking them to supporting evidence, AI helps uncover credits that are often missed by manual sampling.

ix. *What are the audit risks of using AI that doesn't meet IRS documentation standards?* The IRS hasn't issued specific guidance for AI systems, but it holds taxpayers — not *software vendors* — accountable for the accuracy of every claim. If an AI tool can't trace a number back to its source or produce proper documentation, you risk audit exposure. Non-defensible claims create downstream problems: time lost, credibility questioned, and potential financial penalties. The safeguard isn't "AI compliance" — it's *audit-ready traceability and human oversight.*

x. *How does AI tax software strengthen audit defense?* AI makes positions defensible by automating data validation, storing citations, and maintaining full audit trails from source input to filed claim. *When an audit occurs, every number can be traced back to its origin — saving*

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

*hours of manual reconstruction."*

e. October 8, 2025:[37]

i. Onshore helps software teams capture the value of that innovation—translating development work into credible, documented research that stands up to audit and earns the recognition it deserves.

ii. [Onshore] maps each project's objective to its qualifying purpose.

iii. [Onshore] classifies projects by their technical foundation to meet IRS standards.

f. October 7, 2025:[38]

i. [Onshore] ensures that work is *accurately classified and fully documented.* Our process translates the work your firm does into tax credit eligibility that *withstands review.*

ii. Onshore maps each project's objective to its qualifying purpose.

iii. Onshore classifies projects by their technical foundation to meet IRS standards.

g. October 6, 2025:[39]

i. Onshore captures and documents [R&D] efforts precisely. *We identify which activities meet IRS criteria, connect them to the underlying technical principles, and provide audit-ready support to defend every credit.*

ii. Onshore maps each project's objective to its qualifying purpose.

iii. Onshore classifies projects by their technical foundation to meet IRS standards.

---

[37] Mark Stapleton, Demistifying the R&D Credit for Software, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).

[38] Missy Waites, Demistifying the R&D Credit for Architecture, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

[39] Saarah Lalani, Demistifying the R&D Credit for Engineering Firms, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

iv. We turn technical progress into measurable financial impact with clarity, precision, and confidence.

h. October 1, 2025:[40]

i. Every production improvement is a structured experiment. When you develop new tooling, optimize line efficiency, or test material alternatives, you're applying scientific principles to solve technical challenges. That is precisely what the IRS defines as research and development. *Onshore identifies and organizes these activities so your credit claims are precise, supported, and defensible.*

i. August 8, 2025:[41]

i. Using generative AI to draft reports does not improve the quality of inputs. It accelerates output based on whatever assumptions were fed into the system. If the process still depends on interviews, sampling, or same-as-last-year logic, AI has not improved it. It has only made it faster. *True automation analyzes underlying activity directly and applies consistent logic at scale. That is where accuracy improves and risk declines.*

ii. *Interviews Are a Technology Limitation, Not a Best Practice.* Interviews became standard because there was no scalable way to analyze complex work directly. For decades, that limitation shaped how studies were conducted. That limitation no longer exists. *AI can now analyze large volumes of documentation, structure unstructured data, and evaluate activity without relying on memory or retrospective estimates.* Continuing to depend on interviews is not conservative. It is outdated. *Replacing interviews with narrative-generating AI does not solve the problem. It preserves it.*

iii. By applying AI to analyze real work activity and supporting evidence directly, *Onshore removes estimation from the R&D credit process. Reports are delivered quickly because the system is precise. Defensibility improves because conclusions are grounded in documented evidence, not narrative generation.*

[40] Michael Galdieri, Demistifying the R&D Credit for Manufacturers, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

[41] AI Should Eliminate Estimates, Not Just Write Them Faster, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

j. June 30, 2025:[42]

i. Onshore is built around how the IRS actually examines R&D credits. *Our platform analyzes research documentation at scale and produces project-level support, cost traceability, and exam-ready reports aligned with IRS expectations. In weeks, not months, clients receive a complete, defensible R&D credit file and the confidence that comes with it.* R&D credit exams are not rare events. They are foreseeable outcomes. The only real decision is whether you prepare before the exam or gamble during it.

k. April 7, 2025:[43]

i. Accurately identifying QREs requires deep specialization. It involves analyzing multiple versions of regulations, decades of case law, and extensive IRS guidance. Many firms do not invest at that level. As a result, credits are often prepared by individuals who lack the tax background required to apply the rules correctly.

ii. *Modern AI systems are trained on the whole body of R&D tax law, including statutes, regulations, court cases, and IRS guidance. They apply rules consistently and surface eligible costs that manual processes often miss. When paired with expert review, AI enables a more complete, defensible, and accurate R&D credit.* The result is simple: more qualified costs identified, less risk, and more value captured.

l. January 6, 2025:[44]

i. "At Onshore Technologies, we built a platform designed to replace SALY ["Same as last year"] with a repeatable, evidence-based process *supported by experienced industry experts who stay current with the [R&D] credit.*"

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

---

[42] Mark Stapleton, Why R&D Credits Should be Built to Defend, Not Just Claim, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026 (emphasis added).

[43] How to Avoid Missing Qualified Research Expenses, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

[44] Don't Follow SALY: Why "Same As Last Year" is Costing You R&D Credits, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

m. December 20, 2024:[45]

i. The Real Hidden Costs of R&D Credits

- Endless Interviews: What started as a 1990s workaround is still standard today. Each "quick" 60-minute interview turns into hours of prep, lost focus, and rework — costing roughly 3x the person's hourly rate.
- IRS Exams: When firms rely on subjective interviews instead of documented evidence, audit risk spikes. Unprepared clients often face steeper adjustments and longer exams.
- Manual Data Gathering: Legacy processes still require finance teams to export, reformat, and reconcile data manually, a task that's repetitive, error-prone, and avoidable.
- Delayed Reports: Firms typically deliver the credit number first, followed by documentation months later, leaving taxpayers vulnerable if the IRS comes knocking.
- Missed QREs: Complex R&D rules demand experience. Junior consultants and outdated methodologies routinely overlook qualified expenses.

ii. The Systemic Problem. The CPA model is built on human labor and billable hours, not intelligent infrastructure. Lowering fees doesn't eliminate costs; it just shifts them to your team's workload and risk exposure. As long as humans manually interpret complex data, hidden costs will continue to multiply.

iii. The New Standard: AI-Driven R&D Credit Intelligence. Forward-thinking companies are cutting hidden costs by replacing manual reviews with intelligent systems. By automating data extraction, classification, and audit-ready documentation, AI technology like Onshore eliminates more than 80% of the tedious tasks that once hindered R&D studies, making them slower, more subjective, and riskier. This is what we call modern Tax Technology. It is the intersection of AI and human domain expertise that delivers faster, cleaner, and fully traceable R&D credits. The result: 80% less manual work; Highter credit accuracy; Complete audit traceability

iv. No endless interviews. No missed QREs. No hidden tax.

---

[45] Still Calculating R&D Credits Without AI? You're Paying a Hidden Tax, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

n. August 5, 2024:[46]

i. When accountants are asked what two plus two equals, the punchline is not four. It is, 'What do you want it to be?' That mindset quietly drives many traditional R&D credit studies.

ii. At Onshore, we do not ask what you want your QRE [Qualified Research Expense] to be. *We gather data from source systems. We analyze the work performed. We apply the law. We compute the credit.* If the answer is smaller, so be it. If it is larger, it is defensible. Because the goal is not a number that feels good. It is a number that holds up.

o. April 8, 2024:[47]

i. AI models can identify qualifying projects, determine who worked on them, and estimate time spent performing qualified research activities based on evidence, not memory. That changes the role of the interview. Instead of guessing first and validating later, AI produces predictions up front. The interview becomes a short review to confirm or adjust the results. *What once took hours now takes minutes. The outcome is not just faster. It is more precise, more defensible, and far easier on the people involved.*

p. March 11, 2024:[48]

i. The Onshore R&D Credit Platform uses AI to reduce R&D credit computation time by up to 80 percent *while maintaining rigorous compliance standards.*

59. In short, Defendants promise fast, accurate results with little to no interviews or "back and forth" with their client. Defendants advertise that their work product wholly aligns with current law and "IRS standards," and their products are

---

[46] What Do You Want Your QRE to Be?, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

[47] The Real Cost of R&D Credit Interviews, ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

[48] The IRS Is Using AI. Your Tax Department Should Too., ONSHORE TECHNOLOGIES, INC. (last accessed March 6, 2026) (emphasis added).

"defensible" and able to withstand professional scrutiny by the IRS. Defendants advertise that they provide "structured expert review," employ a team of tax professionals that "validates every prediction," and that every R&D Tax Credit study they perform includes "in-product citations that make each calculation traceable and audit ready." These are factual statements, and can be proven either true or false. Alliant has reviewed, and will continue to review, Defendants' work product and will prove at trial that Defendants' statements are false.

**F. Defendants Continue their Misleading and Unfair Marketing Campaign on Social Media, Which is Broadcast to Potential and Actual Clients Located Within the State of California**

60. Defendants' advertising extends beyond their website and extends onto social media. Vitucci in particular has been very active on LinkedIn.[49] Vitucci promises that Onshore can complete an R&D Tax Credit study in ten (10) days, and that *no tax professional is needed* – "a person on the manufacturing line can do it."




[49] While Alliant was drafting this Complaint, it appears that Vitucci disabled public viewing of his LinkedIn profile. However, Alliant had previously captured "screenshots" of Vitucci's posts and has replicated them below.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

61. Vitucci peddles Onshore's services at far less than the competition, because Defendants "get massive cost advantages using AI instead of people for manual repetitive tasks."




62. Vitucci advertises that Defendants are able to charge clients at less than industry standard because the entire R&D Tax Credit process is as simple as: "Feed documents in, get analysis out."

63. Vitucci also advertises that Defendants can help clients receive millions of dollars from the federal government by filing tax amendments for the prior three years. Once more, Vitucci promises this process is as simple as running data "through our systems" and generating new credit figures. Vitucci promises that at the end of this process, "the government will cut you a check[.]"

64. Vitucci publicly promotes that Onshore can accurately perform R&D Tax Credit studies without ever performing client interviews.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195



Dominic Vitucci • 2nd
+ Follow
CEO @ SPRX | Former CPA at Top 5 Global Firm | Claim...
3mo •

Nobody hates their CPA more than the day after they filed their tax return. Real quotes:

"This guy sucks."

"This guy's a fucking clown."

"I'm not working with this person."

If you're a business controller, CFO, or CPA feeling that way, there are better options.

As soon as we have our first kickoff call with clients and we start to explain, "Here's the process. This is the software. Do these things and this happens automatically."

It's just so dramatically different than what they're used to, they get really energized by the tangible difference that they can feel with their hands.

Their prior big firm would have been trying to schedule 50 interviews right now.

They ask "when do the interviews happen?"

We say "never."

Smiles appear.

65. Facing criticism regarding Onshore's AI analysis, Vitucci publicly proclaimed that the criticism was false, because Defendants "ARE experts":



I am a CPA. I started SPRX with the former head of R&D tax credits from Grant Thornton. We are not outsiders. We are insiders who are approaching this problem in a different way. And are now spreading the truth that these guys don't want you to know.

So what do they do when their back is up against the wall?

They plant the seeds of fear.

AI isn't tested.
This is a scam.
There is no replacement for the experts.

All false. We ARE experts. We are also just technologists. And we're using technology to provide better service to customers at a lower cost.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

66. In further promoting Onshore's R&D Tax Credit services, Vitucci has publicly claimed that Onshore's AI systems "knows the tax code, the case law, and the audit patterns." And, should one of their clients ever face scrutiny by the IRS, Defendants simply "pass that request through the system and it generates a fully contextual, well-reasoned, audit-ready response." This is false advertising because, upon information and belief, these AI-generated responses are not and cannot be accurate or "audit-ready," nor does Onshore's AI system have the capability of truly understanding and accurately implementing the "tax code, the case law, and the audit patterns."




HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

67. Relatedly, Vitucci also boasts about how Onshore has never had its analyses audited. While he claims that Onshore is simply "that good," audits take place years in arrears, and Defendants have not been active long enough for there to be any sufficient risk of audit, let alone an audit history. To be clear though, it is false advertising for Defendants to claim that their work product is "defensible" in an audit, when, upon information and belief, their methodologies (or lack thereof) have yet to face scrutiny by the IRS.




HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

### G. Defendants Target Alliant Employees and Confidential Information

68. Because Defendants' AI models require material for guidance, Defendants have targeted Alliant's employees, clients, and confidential information—including those in California—to feed into their AI system. There are at least six (6) Onshore employees in California helping to either train the AI or sell Onshore's product. Upon information and belief, Defendants have uploaded prior years' Alliant R&D Tax Credit studies into their system to learn from. Alliant did not grant authorization for Defendants to do this.

69. Defendants have also solicited and hired at least twenty-two former Alliant employees to further their unfair competition, representing over 50% of Alliant's business development unit. Employees in Alliant's business development unit serve as the direct contact point between clients and CPA Referral Sources on the one hand, and Alliant on the other. Indeed, these employees have relationships with Alliant's clients and CPA Referral Sources in specific geographical regions (including California), and Defendants targeted these employees to gain access and exploit these relationships. Alliant's business development employees also have access to Alliant's confidential information regarding its clients, including compiled contact information, preferences, and R&D activity history. Defendants targeted these employees to gain access to Alliant's confidential information.

70. More recently, Defendants have also targeted a small number of Alliant's implementation personnel. These employees have access to Alliant's confidential information regarding its proprietary methodologies for calculating the R&D Tax Credit, and have access to Alliant's prior year R&D Tax Credit studies. Defendants targeted these employees to gain access to Alliant's confidential information.

71. Indeed, upon information and belief, Lon O'Connor has played a primary role in soliciting and hiring Alliant employees at Onshore, and facilitating those employees to unlawfully share Alliant's confidential information and business

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

relationships with Onshore.

72. Defendants knew that these Alliant employees owed continuing contractual obligations to Alliant prior to hiring them, but consciously ignored those obligations and hired them anyway. Former Alliant employees currently comprise between 33% and 50% of Onshore's total employee population, and approximately half of Onshore's salesforce are former Alliant employees.

73. Onshore's misconduct towards Alliant is active and deliberate and the effects of this illegal conduct is felt in California. Onshore affirmatively has recruited and continues to recruit restricted Alliant employees and places them in the same or similar competitive roles in the same markets, where Alliant's confidential information is disclosed to Defendants and used to unfairly compete with Alliant. Indeed, Vitucci has publicly proclaimed that non-competes are "basically unenforceable":



74. Onshore simultaneously does not implement any guardrails, safeguards, or compliance protocols to prevent the unlawful use of Alliant's confidential information. Through both its actions and intentional inactions, Onshore ensures that its new hires from Alliant can freely leverage the confidential information they learned and had access to while at Alliant to advance Onshore's business interests.

75. By way of example, Michael Galdieri ("Galdieri"), a former Alliant Business Development Director based in New Jersey, resigned from Alliant on January 6, 2025, and immediately joined Onshore. As a Business Development Director at Alliant, Galdieri had wide access to Alliant's confidential information. Galdieri was solicited to join Onshore by Lon O'Connor, Onshore's California-based Chief Revenue Officer and former Alliant employee. Lon O'Connor has attempted to and/or successfully solicited several Alliant employees to join Onshore from California.

76. Galdieri is subject to an employment agreement. This employment agreement is the same or substantively similar to the employment agreements that most former Alliant employees were required to sign. Prior to resigning, on the day he was scheduled to have a conversation with Onshore, Galdieri uploaded Alliant's confidential files, including but not limited to client lists, CPA Referral Source lists, email-target lists, opportunity trackers, and the detailed "R&D Opps Closed 2019–2022" spreadsheet, onto his personal Trello account. The R&D Opps Closed spreadsheet contains all of Alliant's sales activity, including sales activity that Galdieri was not involved in.

77. This "data dump" was unusual activity for Galdieri. Based on a forensic examination of his computer, Galdieri had never previously uploaded the volume of files/lists/information as he did on the day he was scheduled to initially meet with Onshore. Further, there is evidence that Galdieri sent Alliant's confidential information to his personal Gmail account. Alliant's policies, procedures, and agreements strictly prohibit this activity.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

78. Among the information misappropriated by Galdieri was California specific confidential and proprietary information that has since been used by Defendants in their deliberate efforts to target Alliant's California customers.

79. Specifically, Defendants have used the information to deliberately solicit a former Alliant client in this district and solicited and/or poached several others throughout the state of California. This is a direct result of Onshore's use of Alliant's confidential and proprietary information.

80. Further, by joining Onshore when he did, Galdieri directly violated the restrictive covenant not to compete in his employment agreement. After joining Onshore, Galdieri performed substantially the same role he held at Alliant. After joining Onshore, Galdieri contacted Alliant's CPA Referral Sources and Alliant's clients, including those in California, he only came to know during his employment with Alliant.

81. Alliant sued Galdieri for breach of his employment agreement, among other claims, and otherwise placed Onshore on further notice of Galdieri's contractual obligations. Nevertheless, Onshore continues to employ Galdieri.

82. By way of further example, over the course of 2025, Onshore continued its raid of experienced and knowledgeable Alliant employees, including Associate Director Jake Moross ("Moross"), Relationship Director Malaika Irfan ("Irfan"), and Timothy Taschner ("Taschner"), a 10-year Alliant employee and member of the agriculture and life sciences practice.

83. Following these successive resignations, Galdieri (Jan 6, 2025), Moross (Jan 7, 2025), Irfan (Aug 27, 2025), and Taschner (Sept 26, 2025) each breached their respective agreements with Alliant by becoming employed with Onshore and, upon information and belief, using Alliant's confidential information and trade secrets to compete with Alliant.

84. At least one other former Alliant employee was also found to have taken,

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

or trying to take, Alliant client lists upon his departure, only for Alliant to then find out months later that he was employed by Onshore.

85. And, several of the former Alliant employees gave reasons during their resignations to Alliant (i.e., health or family reasons) that seemed to hide their intent to go work for Onshore.

86. As a result of numerous prior, enforcement actions, Onshore was indisputably on notice that Alliant employees were bound by non-competition, non-solicitation, confidentiality, and return-of-information provisions.

87. Indeed, Onshore's current Vice President of Sales, Lon O'Connor, hired by Onshore prior to 2025, is herself a former Alliant employee. She was well aware that all Alliant sales employees were bound by employment agreements with Alliant.

88. Despite indisputable notice, Onshore continues its targeted raid on Alliant employees and placing each hire into the same competitive functions or functions where their knowledge of Alliant's confidential information would be used to Onshore's advantage.

89. The volume of Alliant employee hirings and immediate breach of their respective agreements, by joining the same competitor, Onshore, strongly indicates an organized scheme by Onshore to affect not only the transfer of Alliant employees, but also its confidential information, its goodwill and reputation, and its clients and CPA Referral Sources, to Onshore. Indeed, Defendants are very open about the fact that their AI models need source information to train on. Upon information and belief, these ex-Alliant employees provided and continue to provide Defendants with Alliant's confidential information to feed into their AI models.

90. By way of further example, in July 2025 Alliant was contacted by one of its clients who had attended a pork production industry conference earlier that month. At that conference, Onshore placed advertisement brochures related to pork production R&D activities in the seats of every conference attendee (approximately 1,000 seats).

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

91. Alliant reviewed Onshore's brochure and noticed strong similarities between it and its own advertisement brochure on R&D developments in the pork production industry. The brochures contained similar color schemes, general background images, and almost identical listed business activities. Indeed, it appears that Onshore fed its AI model a copy of Alliant's brochure and directed it to simply "re-word" the same content. Alliant did not authorize Onshore to do this.

***Alliant's Brochure***




***Onshore's Brochure***




92. Over the ensuing months, Alliant made numerous requests and demands for compliance with their former employees' obligations to Alliant and, specifically, the return and securing of its confidential information in the hands of former employees that had openly violated their other obligations to Alliant and joined Onshore with, and likely because of, their continuing knowledge and ability to exploit Alliant's confidential information on behalf of their new employer, Onshore.

93. Despite these numerous requests and Onshore's knowledge of the employees' breach of their obligations to Alliant, Onshore continually refused to offer any assurances regarding the protection of Alliant's confidential information and,

instead, all such information remains in the possession and control of Onshore employees with no assurance of its security or protection from disclosure or use.

94. Through these continued acts of commission and omission, Onshore enables and encourages the misuse of Alliant's confidential information, which includes protected taxpayer identifying information pursuant to Code Section 7216.

95. By continuing this pattern, knowingly hiring restricted employees, intentionally disregarding their legal obligations, placing them in identical competitive roles, and refusing to implement the most basic confidentiality safeguards, Onshore has willfully interfered with Alliant's contracts and knowingly misappropriated Alliant's confidential information and violated Code Section 7216 in the process.

96. Alliant maintains existing client engagements and referral relationships that are disrupted by Onshore's inducement and use of Alliant's confidential information.

97. The misappropriation and tortious interference caused loss of business, erosion of goodwill, and threats to client confidentiality.

### H. Defendants Disparage Alliant and Publicly Promote False Advertisements

98. On June 2-6, 2025, Onshore (though still known as SPRX at the time) representatives, including Vitucci, attended the Control Systems Integrators Association Conference in San Diego, California.[50] According to the attendee list, 64 of the 464 attendees were from California.[51] Additionally, SPRX/Onshore was an "Exhibitor" at the conference wherein they, upon information and belief, peddled the aforementioned false advertisements.[52] Onshore used the Control Systems Integrators

[50] 2025 CSIA Conference Attendee Directory, CSIA, https://na.eventscloud.com/directreports/?a571690e617eacacdc80954d4eaabf02MjAyNS0wMyM2N2MwNmM4MWE0MGQy.
[51] Id.
[52] 2025 CSIA Conference Exhibitor Directory, CSIA, https://na.eventscloud.com/directreports/?0c326ba408d07cfcf73672a47e5d6211MjAyNS0wMyM2N2MwNmRhNmRkZTI4.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Association and paid $2,300 to promote its products or services, meet attendees, and develop business relationships in the state of California.

99. On February 20, 2026, Alliant received a telephone call from a CPA Referral Source in Iowa (the "Iowa CPA") regarding Onshore. The Iowa CPA reported that Taschner had been contacting several of his clients, explicitly telling them to not use Alliant's services, or to discontinue their use of Alliant's services, because "everything they do is offshore and sent to India." However, in these same conversations, Taschner boasted of his time at Alliant and his relationships with members of Alliant's strategic advisory board team. When asked to confirm whether he was still affiliated with Alliant, Taschner became evasive and would not answer. Upon information and belief, Taschner's acts and statements here were at the explicit direction of Vitucci.

100. Around the same time, Vitucci and Taschner appeared as guests on the podcast "Farm4Profit," and described their business model to the hosts and their listeners while also disparaging their competitors.[53] During this appearance, Vitucci and Taschner confirmed that Onshore's name change was meant to disparage competitors like Alliant, who they assert send all of their work "overseas."[54] Vitucci stated that taking this work "overseas" leads to breaches in data security, and strongly insinuated that clients should not trust Onshore's competitors with their proprietary R&D information because it would be intercepted or otherwise leaked to foreign governments and competitors.[55]

101. Vitucci's comments were not made in isolation, they are part of a deliberate false advertising campaign against Alliant for purposes of unfairly competing with them. Indeed, Alliant has discovered that Corey Standley, another ex-Alliant employee now employed by Onshore, has contacted one of Alliant's prospective clients

---

[53] Unlocking R&D Tax Credits for Farms with Onshore, FARM4PROFIT PODCAST (uploaded to YouTube on February 23, 2026), https://www.youtube.com/watch?v=5aq2vF9rclI.
[54] Id. at 6:35–6:50.
[55] Id. at 6:54–7:32.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

and informed them that his ex-employer was overly reliant on offshore work and too heavily "sourced information overseas."

102. For his part on the podcast, Taschner represented that he had been part of IRS audits, and the auditors approved of the information he presented.[56] This is extremely misleading, because, upon information and belief, Onshore once again has never been audited. Taschner advertises that Onshore is capable of taking customers through "chapter, line, and verse" of the IRC and Treasury Regulations to corroborate their methodologies and analysis.[57] Taschner boasts that Onshore was able to help a client claim a $75 million R&D Tax Credit,[58] but this is false advertising because, upon information and belief, this is a reference to work performed at Alliant for an Alliant client; Onshore had nothing to do with this particular study.

103. During this same podcast appearance, Vitucci claims that Onshore stands behind its work, and should an audit occur, Onshore will send "a litany of incredibly experienced folks" to "descend upon" the situation and defend the methodology.[59] Vitucci asserts that Onshore "has done hundreds if not thousands" of credit studies, and the IRS has never objected to the methodology.[60] Again, this is materially misleading, false advertising because, upon information and belief, Onshore's work has never been audited nor substantively reviewed by the IRS. It is also misleading because Onshore is relatively new (about five years old), has only grown in its presence over the last two or so years, and so the client-taxpayers relying on Onshore's work simply may not have been audited *yet*.

### I. Alliant Reviews Onshore's Work Product

104. Alliant was recently contacted by a CPA Referral Source who had reviewed an Onshore R&D Tax Credit study which he had been provided by an Onshore

---

[56] Id. at 27:27–27:40.
[57] Id. at 1:01:13–1:01:17.
[58] Id. at 1:07:31.
[59] Id. at 1:03:38–1:04:12.
[60] Id. at 1:04:36–1:05:00.

client for use in filling out the client's tax return. The CPA reviewed the study, and did not feel comfortable relying on it when filling out the client's tax return due to its material flaws. With client permission, the CPA sent Alliant a copy of the Onshore study for analysis.

105. Tax professionals at Alliant reviewed the study, and were similarly concerned at its material defects. It became readily apparent this study had neither been prepared nor reviewed by competent, "expert" tax professionals. For example, Onshore misstated the four (4) part test for qualified research under Code Section 41(d), and stated that "permitted purposes" is part of the test instead of "new or improved business component." Any competent, expert tax professional familiar in the R&D Tax Credit sphere would have caught this flaw immediately during review.

106. Next, the report fails to identify any actual Business Components required for taking the R&D Tax Credit. Pursuant to Code Section 41(d)(2)(B), a Business Component is specifically defined to be a "product, process, computer software, technique, formula or invention." Rather than identify specific Business Components, Onshore has identified "mechanical engineering," "electrical engineering," "automation," "fabrication," and "packaging equipment" as this particular client's Business Components. These selections do not align with the law, because these items are not specific products or techniques and are rather broad-brush categories of capabilities the client has. Moreover, because Onshore split "engineering" apart from "automation," "fabrication," and "packaging equipment," that suggests that no engineering occurs in the "automation," "fabrication," and "packaging equipment" purported Business Components, therefore making them ineligible for any R&D Tax Credit.

107. Because there are no identified Business Components, Onshore cannot show how this client met any part of the four (4) part test for qualified research. There is simply no required funded research analysis, and there is no analysis of any

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

exclusions established in Code Section 41(d)(4). For example, Code Section 41(d)(4)(H) excludes any research "funded by any grant, contract, or otherwise by another person (or governmental entity)." By listing, for example, "mechanical engineering" as a qualified business component, Onshore has neglected to analyze the different research activities being conducted on a contract-by-contract basis. While the client may have been performing some aspect of research within the sphere of "mechanical engineering," they likely were doing it for differing purposes pursuant to different contracts, and each one of those purposes requires a separate analysis to see if the credit applies. Onshore's amalgamation of general capabilities for a client rather than specific Business Components most certainly does not align with the Code or Treasury Regulations.

108. Making matters worse, Onshore did not factor in what Qualified Research Expenditures (QRE's) could be taken from a Business Component and allocated towards the final R&D Tax Credit calculation. Instead, Onshore took a shortcut and *tied all employees in with all business components*, and did not describe any activities by any of those employees to justify why those activities qualified as a QRE.

109. Onshore's report also does not use a historical cost base analysis. Because the R&D Tax Credit provides a credit for *increasing* research activities, its accurate calculation requires a comparison to prior years when the client previously performed research pursuant to Code Section 41(c). By not making any reference to a historical cost base analysis, it appears that Onshore simply took figures from the client's previous reports (likely from Alliant) and used those as the entire base analysis. Code Section 41(d)(5) requires base years to be calculated in a manner consistent with the current year's calculation. By calculating the current year's credit in a manner different than prior years', Onshore materially deviated from the Code.

110. Onshore's report is also devoid of any substantiation. There is no mention of how Onshore got these figures by including reference to the source data. There is no

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

mention of any documents, spreadsheets, charts, graphs, or anything that would justify how Onshore arrived at these figures. Indeed, despite Onshore's advertising that every R&D Tax Credit study report provides "in-product citations that make every calculation traceable and audit-ready," none appear. Despite Onshore boasting at how everything they do is substantiated with documentation, there is no reference to any documentation in the report.

111. Finally, the report makes no mention of statistical sampling. Because the R&D Tax Credit calculation must be done on a business component basis, large operations may have thousands of qualified business components (rather than the four (4) listed in Onshore's report), Revenue Procedure 2011-42 permits for, and provides guidance on, the correct IRS-approved ways to conduct statistical sampling. However, based on Onshore's advertising, it seems that no statistical sampling occurred. This makes sense though, because it all relates back to Onshore's flawed identification of business components as general categories of capabilities rather than per activity components, an approach which fails to follow the law.

112. In short, Onshore's report is significantly flawed, and it is impossible that it was approved by any competent tax expert. Onshore's advertising that its AI work is reviewed in any substantive manner by a competent tax professional is false.[61]

**FIRST CAUSE OF ACTION**

**(FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a)(1)(B)) re: ONSHORE'S "EXPERT-REVIEWED" SERVICES)**

113. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

114. The Lanham Act prohibits any person from using in commerce any "word, term, name, symbol, or device, or any combination thereof, or any false designation of

[61] Onshore's flawed R&D Tax Credit methodologies and analyses also likely violate Treasury Department Circular 230, which establishes regulations regarding the practice of accountants and tax preparers before the IRS.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

origin, false or misleading description of fact, or false or misleading representation of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]"

115. Defendants' advertisements of providing "audit-ready," "defensible," verified-by-human-tax-professionals, sufficiently substantiated, and Code compliant R&D Tax Credit studies and services have been continuously advertised by Defendants across the United States in interstate commerce since at least March 2024.

116. Defendants have advertised Onshore's services on Onshore's website, Onshore's blog, LinkedIn, YouTube, podcasts, and various other forms of Social Media.

117. A significant number of clients and consumers in Southern California and across the United States have seen and/or heard Defendants' advertisements. After viewing and hearing these advertisements, it is probable that a substantial segment of consumers looking for assistance in navigating the R&D Tax Credit, acting reasonably, were deceived into believing not only that Defendants' R&D Tax Credit studies were accurate, Code compliant, "defensible," and "audit-ready," but that they were all substantively reviewed by competent tax professionals experienced in the R&D Tax Credit before issuance.

118. Defendants' claims that Onshore's R&D Tax Credit studies are accurate, "defensible," "audit ready," heavily substantiated, personally reviewed by competent tax experts, and/or otherwise compliant with the Code and "IRS standards," are all literally false and/or have the tendency to likely mislead, confuse, and deceive consumers.

119. Defendants' claims about their services are material, and these claims likely influenced consumers to purchase their R&D Tax Credit study services. Consumers have purchased these services from Onshore due to the misimpressions they

formed after reading and listening to Defendants' advertisements and claims that their R&D Tax Credit study services were reviewed by competent, "expert" tax professionals, and were accurate, substantiated, "defensible," "audit-ready," and in compliance with the Code and IRS regulations.

120. Defendants profited from collecting revenue from conducting their R&D Tax Credit studies and services, which they undertook following demand from consumers who viewed, listened, and relied on Defendants' false advertisements that the studies were personally verified by competent, "expert" tax professionals, and were accurate, "defensible," "audit-ready," and in line with the Code and "IRS standards."

121. As a direct competitor of Onshore, Alliant has been injured, and continues to suffer injury, as the result of Defendants' false advertisements through the direct diversion of sales and clients from itself to Defendants, the loss of consumer confidence, and the loss of reputation and goodwill in the R&D Tax Credit services marketplace.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

**SECOND CAUSE OF ACTION**

**(FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a)(1)(B)) re: ALLIANT'S "OFFSHORE" ACTIVITIES)**

122. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

123. Defendants' false statements regarding Alliant sending all of its work "offshore" to India, and in doing so has compromised the security of its clients' information and proprietary R&D activities, have been continuously advertised by Defendants across the United States in interstate commerce since at least February 2026.

124. Defendants have made their false statements regarding Alliant's "offshore" work through direct telephone calls, social media, and podcast appearances.

125. A significant number of consumers across the United States have heard Defendants' false statements regarding Alliant sending all R&D Tax Credit services work "offshore," and further claims that sending this work "offshore" compromises its

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

and its clients' data security.

126. These claims by Defendants are literally false and/or have the tendency to mislead, confuse, and deceive consumers.

127. Defendants' claims about Alliant sending all its work "offshore" and related failure to maintain data security are material, and these claims likely influenced consumers to not purchase Alliant's R&D Tax Credit study and consulting services, and to instead seek Defendants' R&D Tax Credit services.

128. Defendants profited from collecting revenue from conducting R&D Tax Credit studies and services that would otherwise have been directed to Alliant, but for Defendants' dissemination of false statements regarding Alliant sending all its R&D Tax Credit work "offshore."

129. Alliant has been injured, and continues to suffer injury, as the result of Defendants' false advertisements through the direct diversion of sales and clients from itself to Defendants, the loss of consumer confidence, and the loss of reputation and goodwill in the R&D Tax Services marketplace.

**THIRD CAUSE OF ACTION**

**(MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*))**

130. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

131. Alliant owns protectable confidential information including compilations of nonpublic client identities, CPA Referral Sources, pricing structures, opportunity pipelines, R&D Tax Credit calculation methodologies, R&D Tax Credit study reports, analyses of clients' proprietary R&D activities, and related R&D Tax Credit strategy documents that all that derive independent economic value from not being generally known, and are subject to reasonable measures by Alliant to maintain their secrecy.

132. The confidential information to which the former Alliant employees that

are now employed at Onshore was exposed and had access to while employed by Alliant was not publicly known, has been generated and cultivated by Alliant over many years, and gives Alliant a substantial competitive advantage over its competitors and constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3).

133. This confidential and proprietary information derives independent economic value from not being generally known to, and not being readily ascertainable by, proper means by other persons.

134. Alliant took reasonable steps to protect its confidential information, as described herein.

135. Defendants acquired, used, and/or disclosed Alliant's trade secrets without consent.

136. Defendants know they obtained this confidential information and trade secrets by improper means and under duties of confidentiality and limited use.

137. Defendants, without justification or privilege to do so, have misappropriated Alliant's confidential information and trade secrets such as their proprietary methodologies, research, and guidance on the R&D Tax Credit, R&D Tax Credit study results, compilations of client identifications and CPA Referral Sources, related contact information, needs and preferences, and other client and CPA Referral Source related information used in, or intended for use in, interstate or foreign commerce, by taking, retaining, disclosing, and using Alliant's confidential, proprietary, and trade secret information to further Onshore's business interests to directly compete with Alliant.

138. Defendants have taken, retained, disclosed, and used Alliant's confidential, proprietary and trade secret information in their operations, pricing, solicitation of business, and solicitation of Alliant employees and clients to unfairly compete with Alliant. Upon information and belief, Defendants have fed Alliant's confidential, proprietary and trade secret information into their AI systems to guide

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

them, as well as to pass off some portion of Alliant's prior years' R&D Tax Credit work as their own.

139. Defendants have failed to return Alliant's confidential information and trade secrets in their possession and refused to provide any assurances that they are not using or otherwise disclosing such information or have taken any measures to prevent such use or disclosure.

140. As a direct and proximate result of Defendants' actions, Alliant faces the irreparable loss of its confidential, proprietary, or trade secret information, the loss of its competitive position, the loss of business and employee goodwill, the loss of an experienced workforce, loss of sales, and the loss of its investment in time and energy in generating its confidential, proprietary, and trade secret information. Defendants' misappropriation has caused and, unless enjoined, will continue to cause, irreparable harm and significant damages to Alliant.

141. Alliant seeks damages available under the Defend Trade Secrets Act, 18 U.S.C. § 1836, including actual losses, unjust-enrichment damages, and, where appropriate, a reasonable royalty for Defendants' unauthorized use or disclosure of Alliant's confidential information and trade secrets.

142. Alliant's injury resulted from Defendants' willful and malicious misappropriation of Alliant's trade secrets, entitling Alliant to exemplary damages in an amount up to two times the award of damages under 18 U.S.C. § 1836(b)(3)(C).

143. Alliant is entitled to an award of reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D) because Defendants willfully and maliciously misappropriated Alliant's trade secrets.

**FOURTH CAUSE OF ACTION**

**(TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS)**

144. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

145. Alliant has valid, enforceable restrictive covenant contracts and confidentiality agreements with its former employees who have joined Onshore.

146. Defendants knew of these contracts through the recruiting process and subsequent litigation initiated by Alliant against its former employees.

147. Despite knowledge of the employees' obligations to Alliant, Defendants have continued to recruit, solicit and compensate these employees to induce them to breach their obligations to Alliant.

148. Defendants have thus willfully and intentionally interfered by inducing breaches of non-disclosure, non-solicitation, and non-competition covenants.

149. Defendants' interference proximately caused Alliant to suffer actual damages, lost profits, lost opportunities, mitigation damages, benefit-of-the-bargain damages, and loss of goodwill.

150. Further, because the wrongful acts of Defendants have caused, and will cause, Alliant to incur litigation expenses in enforcing the former employees' agreements and other obligations, Alliant is entitled to recover those litigation expenses, as ordinary and foreseeable compensatory damages, from Defendants.

151. Alliant's injury resulted from Defendants' malice or actual fraud, which entitles Alliant to exemplary damages under Cal. Civ. Code § 3294.

## FIFTH CAUSE OF ACTION

## (VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*))

152. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

153. California's Unfair Competition Law ("UCL") prohibits acts of "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Unlawful Prong

154. Defendants engaged in unlawful conduct by marketing their R&D Tax Credit studies and services as being "defensible," "audit-ready," expert-reviewed, and compliant with the Code and "IRS standards." Defendants have engaged in unlawful conduct by advertising their R&D Tax Credit studies and services this way, because their R&D Tax Credit services do not follow or meet these objective, factual standards. Defendants' conduct additionally is unlawful because it violates the following laws: the Defend Trade Secrets Act (18 U.S.C. § 1836), the Lanham Act (15 U.S.C. § 1125), and Federal Criminal Laws Against Wire Fraud (see 18 U.S.C. §§ 1341, 1343), Circular 230 (31 C.F.R. Part 10), and California Civil Code §§ 1709 and 1710.

155. Alliant reserves the right to allege other violations of law by Defendants, which constitute additional unlawful business practices.

Fraudulent Prong

156. Defendants' conduct is fraudulent because they contacted Alliant's clients, prospective clients, and CPA Referral Sources, and discouraged them from using Alliant's services because they falsely claim that Alliant's services are all performed "offshore" and that Alliant sends all its R&D Tax Credit work to India. Defendants further rebranded to "Onshore" and made misleading public claims that sending R&D Tax Credit services "offshore" compromises the security of clients' underlying R&D activities and data.

157. Defendants have further engaged in fraudulent conduct because their material misrepresentations regarding their R&D Tax Credit services, as well as their representations regarding Alliant's R&D Tax Credit "offshore" services, are likely to deceive reasonable clients and prospective clients, and the underlying truth Defendants have concealed is material to reasonable consumers in the marketplace for R&D Tax Credit consulting services.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Unfair Prong

158. Defendants' conduct is "unfair" because the injury to Alliant is substantial; it is not outweighed by any possible benefit to consumers or competition, and it is not an injury that Alliant could have easily avoided.

159. Defendants have further engaged in unfair competition by targeting Alliant's employees, and intentionally soliciting them for purposes of gaining access to Alliant's confidential information and trade secrets, including compiled lists of client and CPA Referral Source identifications, as well as Alliant's proprietary R&D Tax Credit calculation methodologies and studies. Indeed, Defendants have solicited and pilfered a significant percentage of Alliant's business development group for purposes of undercutting Alliant's business and stealing its client base and confidential information.

160. Defendants' unlawful, fraudulent, and unfair conduct, including representations regarding the quality of their services compared to Alliant's are being repeated throughout the state of California and the entire United States. Defendants' targeting of Alliant's employees and confidential information also remains ongoing throughout the United States.

161. As a direct and proximate result of Defendants' unlawful, fraudulent, and unfair acts, Alliant has been damaged and will continue to be damaged by Defendants' unlawful and unfair business practices. Alliant requests injunctive relief from this Court to prohibit Defendants from continuing their unlawful and unfair business practices constituting violations of the UCL.

162. Section 17203 permits Alliant to seek injunctive relief from this Court to enjoin Defendants' continued dissemination of the above false advertisements and misleading statements, and to restore to Alliant any money or property which may have been acquired by Defendants' violations of the UCL. See Cal. Bus. & Prof. Code § 17203.

163. As a direct and proximate result of the dissemination of Defendants' false advertisements and misleading statements, Alliant has been harmed and will continue to face injury unless Defendants and those acting in concert with them are enjoined.

164. Accordingly Alliant seeks an injunction against Defendants, prohibiting them from continuing to unfairly advertise their services as "defensible," "audit-ready," expert-reviewed, sufficiently substantiated, and compliant with the Code and "IRS standards," and further preventing them from disseminating false statements that Alliant sends all of its services "offshore" and does not protect the security of its and its clients' data and R&D activities.

**SIXTH CAUSE OF ACTION**

**(VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *et seq.*))**

165. Alliant repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

166. California's False Advertising Law ("FAL") prohibits the dissemination of any statement to consumers through any medium regarding the quality or feature of a service or product "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

167. Defendants' advertisements that their R&D Tax Credit consulting services are "defensible," "audit-ready," expert-reviewed, sufficiently substantiated, and compliant with the Code and "IRS standards" are untrue and misleading.

168. Defendants' further statements that Alliant sends all its work "offshore" to India, and by extension fails to protect its and its clients' data, are also untrue and misleading.

169. Defendants disseminated these advertisements and statements through public publication on their website, social media, podcast appearances, and direct

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

telephone calls to consumers and potential consumers of Alliant's R&D Tax Credit consulting services.

170. Defendants knew or reasonably should have known, through the exercise of reasonable care, that their representations were false and misleading, and likely to deceive consumers which resulted in consumers purchasing Defendants' R&D Tax Credit consulting services instead of Alliant's R&D Tax Credit consulting services.

171. The dissemination of Defendants' false advertisements and misleading statements is ongoing, and part of a general practice that continues to be perpetuated and repeated throughout the state of California and nationwide.

172. Section 17535 permits Alliant to seek injunctive relief from this Court to enjoin Defendants' continued dissemination of the above false advertisements and misleading statements, and to restore to Alliant any money or property which may have been acquired by Defendants' violations of the FAL. See Cal. Bus. & Prof. Code § 17535.

173. As a direct and proximate result of the dissemination of Defendants' false advertisements and misleading statements, Alliant has been harmed and will continue to face injury unless Defendants and those acting in concert with them are enjoined.

174. Accordingly, Alliant seeks an injunction against Defendants, prohibiting them from continuing to advertise their services as "defensible," "audit-ready," expert-reviewed, sufficiently-substantiated, and compliant with the Code and "IRS standards," and further preventing them from disseminating false statements that Alliant sends all of its services "offshore" and does not protect the security of its and its clients' data and R&D activities.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

## PRAYER FOR RELIEF

WHEREFORE, Alliantgroup, L.P. prays for judgment against Defendants, jointly and severally, as follows:

***Preliminary Injunction***

i. A preliminary injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to make false and/or misleading representations of fact about their R&D Tax Credit studies and services, including, but not limited to, that Onshore's R&D Tax Credit studies and services are "defensible," "audit-ready," expert-reviewed, and compliant with the Code and "IRS standards;"

ii. A preliminary injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to make false and/or misleading representations of fact regarding Alliant's R&D studies and services, including, but not limited to, that Alliant sends all of its work "offshore" to India and does not adequately protect its and its clients' data;

iii. A preliminary injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to use Alliant's confidential information or trade secrets in any manner or medium whatsoever;

iv. A preliminary injunction requiring Defendants to immediately return all Alliant confidential information and trade secrets to Alliant;

***Permanent Injunction***

i. A permanent injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to make false and/or misleading representations of fact about their R&D Tax Credit studies and services, including, but not limited to, that Onshore's R&D

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

Tax Credit studies and services are "defensible," "audit-ready," expert-reviewed, and compliant with the Code and "IRS standards;"

ii. A permanent injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to make false and/or misleading representations of fact regarding Alliant's R&D studies and services, including, but not limited to, that Alliant sends all of its work "offshore" to India and does not adequately protect its and its clients' data;

iii. A permanent injunction enjoining Defendants, and any person or entity acting in active concert with Defendants, from continuing to use Alliant's confidential information or trade secrets in any manner or medium whatsoever;

iv. A permanent injunction requiring Defendants to return all Alliant confidential information and trade secrets to Alliant;

***Judgment***

i. A final judgment finding that Defendants have engaged in false and misleading advertising in violation of 15 U.S.C. Section 1125(a)(1)(B);

ii. A final judgment finding that Defendants have unlawfully misappropriated and used Alliant's confidential information in violation of 18 U.S.C. Section 1836;

iii. A final judgment finding that Defendants have tortiously interfered with Alliant's existing contracts with its former employees now employed by Onshore;

iv. A final judgment finding that Defendants have engaged in unfair competition and acts of unfair and deceptive business practices in violation of California Business & Professions Code Section 17200;

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

v. A final judgment finding that Defendants have engaged in untrue and misleading advertising in violation of California Business & Professions Code Section 17500;

vi. A final judgment awarding Alliant damages, in an amount to be fixed by the Court, as well as all of Defendants' profits or gains of any kind from their acts of false advertising, misleading statements, and unfair business practices;

vii. A final judgment awarding Alliant its court costs and fees, including all reasonable attorneys' fees it has incurred and will incur in this matter;

viii. A final judgment awarding Alliant prejudgment and post-judgment interest; and

ix. A final judgment awarding Alliant such other and further relief, at law or in equity, to which it may be justly entitled.

Date: July 29, 2026

HENNEMAN RAU & KIRKLIN LLP
HAWXHURST LLP

By: */s/ George H. Rau III*

Matthew B. Henneman
George H. Rau III
Joseph A. Cialone III
Gerald E. Hawxhurst
Patrick B. Nichols
Attorneys for Plaintiff,
Alliantgroup, L.P.

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

I, Jeremy M. Fingeret, declare as follows:

1. I am over the age of 21, have never been convicted of a felony or misdemeanor involving moral turpitude, and am fully competent to make this declaration. I make this declaration pursuant to 28 U.S.C. § 1746.

2. I am an authorized representative for Plaintiff Alliantgroup, L.P. ("Alliant") in this matter, and currently serve as its Chief Quality Officer.

3. I have read Alliant's First Amended Original Complaint and Application for Injunctive Relief and to the best of my personal knowledge verify that the facts alleged therein are true and correct, and that I have made a reasonable inquiry into those allegations pleaded upon information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 29, 2026.

Jeremy M. Fingeret

HAWXHURST LLP
10000 SANTA MONICA BOULEVARD, SUITE 3406
LOS ANGELES, CALIFORNIA 90067
Tel: (310) 893-5150 • Fax: (310) 893-5195

**DEMAND FOR JURY TRIAL**

Plaintiff Alliantgroup, L.P. hereby demands trial by jury on all matters so triable.

DATED: July 29, 2026

HENNEMAN RAU & KIRKLIN LLP
HAWXHURST LLP

By */s/ George H. Rau III*
Matthew B. Henneman
George H. Rau III
Joseph A. Cialone III
Gerald E. Hawxhurst
Patrick B. Nichols
Attorneys for Plaintiff,
Alliantgroup, L.P.